[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The Department of Children and Families (DCF) filed petitions to terminate parental rights concerning Ashley D., a minor child CT Page 9411 whose date of birth is December 29, 1987. The child's biological parents, Kelly D. and Michael P., are named as the respondents in this action. (The parents were never married to each other.)
Pursuant to the applicable subsections of C.G.S. §17a-112 (b), DCF has alleged the following three statutory grounds for termination against the respondent father: abandonment, no ongoing parent-child relationship, and acts of commission or omission which have denied the child the care, guidance or control necessary for her physical, educational, moral or emotional well-being. With respect to the respondent mother, the petitioner has alleged two counts under C.G.S. § 17a-112 (b): parental failure to rehabilitate and acts of commission or omission.
Procedural History
Ashley D. first came to the attention of the Superior Court for Juvenile Matters in Plainville on April 15, 1992, when DCF filed a neglect petition. She was subsequently adjudicated as a neglected and uncared for child and placed under protective supervision at a court hearing on December 16, 1992. On April 6, 1993, DCF received ex parte orders awarding it temporary custody of Ashley and her brother, Adam, based on allegations that the children had been physically abused by Geoffrey G., the mother's live-in boyfriend. The petitioner subsequently filed a motion with the court in Plainville seeking to modify the disposition of protective supervision which had entered on December 16, 1992. That motion was granted by the court on April 23, 1993 and the court committed Ashley's care and custody to DCF on that date. The child has remained under commitment to the state from April 23, 1993 through the present time. The initial commitment was extended by the court on October 23, 1994 and May 23, 1996.
DCF filed its termination petitions in this matter on February 16, 1996 at the Superior Court for Juvenile Matters in Plainville. The case was subsequently transferred to this venue for trial.
A contested trial was held before this court on April 3-4, 1997. The mother was present in court and represented by her attorney throughout the proceeding. The petitioner, and the minor child, were also represented during the entire hearing by their respective counsel. CT Page 9412
The biological father, Michael P., did not appear during this termination proceeding and was not represented by counsel. The Superior Court for Juvenile Matters in Plainville issued an order on February 26, 1996 that notice of the termination proceeding be made upon the respondent father by publication in a Florida newspaper with circulation in the city of his last known address. On June 12, 1996, the court (Wiese, J.) confirmed that notice to the father by publication had been made.
Based on the return of service and finding by the court concerning notice to the father by publication, and based upon the fact that Kelly D. appeared throughout this proceeding in person and through counsel, the court finds that both of the respondents were afforded notice of the termination proceeding, and that this court has jurisdiction over the matter.
At trial, the petitioner introduced 11 documents into evidence as full exhibits. DCF also introduced the testimony of the following witnesses:
 1. Carol D'Amora, social worker, Connecting Children and Families Program;
2. Kathy Dayner, social worker, DCF;
3. Diana Forbes, social work supervisor, DCF;
4. Michael Pines, Ph.D., psychologist.
The respondent, Kelly D., testified on her own behalf at trial. Counsel for the minor child participated fully in the proceeding but did not offer any evidence or testimony.
Factual Findings
The court, having considered all of the evidence and testimony adduced at trial, makes the following factual findings:
The biological father, Michael P., has had no contact with Ashley since the child was three weeks old. (Testimony of Kelly S.) He has never paid child support for his daughter, who is now nine years old. (Testimony of Kelly S.) Michael P. has never sent Ashley any cards, gifts or letters. (Testimony of DCF social workers Dayner and Forbes.) CT Page 9413
The evidence relating to Ashley's emotional problems, and her relationship with her mother, is far more complex.
Ashley suffers from serious psychiatric problems which were first diagnosed when she was four or five years old. (Testimony of Dr. Michael Pines). She has been diagnosed with Post Traumatic Stress Disorder (PTSD) and Reactive Attachment Disorder. (Testimony of Dr. Pines). The child has in the past manifested self-destructive behavior, tantrums, aggressive actions and provocative sexual behavior. (Testimony of Dr. Pines). According to Dr. Pines, the psychological evaluator, Ashley's condition is "quite serious" for such a young child. One social worker described the child as being "very disturbed." (Testimony of Diana Forbes). Ashley is now nine years of age, and will turn 10 next December 29th. Her psychological condition was previously so acute that by age seven, she had already spent 29 months in hospital placements. (Testimony of Diana Forbes). She has resided in a specialized foster home continuously for the past two years, since being released from in-patient psychiatric hospitalization. Her behavior and psychological condition since going to this foster home have improved demonstrably.
In 1989, Kelly D. took Ashley to Hartford Hospital as the result of suspicion that she had been sexually abused. (Testimony of Diana Forbes). Kelly D. had lived until 1991 with a man named Ishmail R., and there were references during this trial to allegations that he had abused Ashley. (Petitioner's Exhibit 5, Page 4).
In October, 1991, several months prior to the child's fourth birthday, Ashley was hospitalized at St. Raphael's Hospital for aggressive, oppositional and unmanageable behavior. (Petitioner's Exhibit 5, Page 6). According to a DCF social study prepared in connection with the TPR case, Ashley engaged in sexually explicit behavior in the presence of staff at the hospital. (Petitioner's Exhibit 5, Page 6).
Kelly D. ceased residing with Ishmail R. in 1991 and moved into her parent's home with her children for a period of time. (Petitioner's Exhibit 5, Page 5). She subsequently began a relationship with Geoffrey G. and started living with him. Kelly D. now has two children by Geoffrey G.[1]
In April 1992, DCF filed a neglect petition alleging that Ashley was uncared for by her mother, and abandoned by her CT Page 9414 father, Michael P. The uncared for petition alleged that Kelly D. could not provide the specialized care which the child's physical, emotional or mental condition requires. It further alleged that Ashley "has specialized needs in that she needs a structured environment with continual and individual supervision." Around the time that this petition was filed, the mother voluntarily placed the child in a group home operated by the Wheeler Clinic. Ashley resided there from April 27, 1992 until June 5, 1992. On June 5th, the child was transferred to a specialized foster home operated by Wheeler Clinic. This placement was also made with Kelly D.'s consent. The child resided there until July 12, 1992, when she returned to live with her mother. Wheeler subsequently closed the specialized foster home because the foster parents had left Ashley for a weekend with other relatives without the agency's permission, and because the foster parents (at Kelly D.'s request) had discontinued giving Ashley medicine which had been prescribed for her. (Testimony of Diana Forbes). The pending neglect petition against the mother was resolved on December 16, 1992 when the court in Plainville entered a finding that Ashley was neglected and uncared for. Ashley was placed under a six-month period of protective supervision, and allowed to remain with her mother.
As noted above, on April 6, 1993, Ashley and her sibling, Adam, were removed from their mother's care and placed in the petitioner's custody pursuant to the OTC issued by the court in Plainville. The basis of the temporary custody orders were allegations that Geoffrey G. had physically abused both children. At the time it requested the OTC, the petitioner also filed a motion to modify judgment, in which it sought a change from protective supervision status to a commitment of the child's custody. Ashley was thereafter committed to DCF by the Plainville court on April 23, 1993. (Petitioner's Exhibit 5, Page 2). At the time of commitment, Kelly D. signed court-approved expectations (Petitioner's Exhibit 2) which will be discussed at greater length below. Ashley has remained continuously in the petitioner's custody since the OTC was granted on April 6, 1993.
During a psychological evaluation conducted by Dr. Pines in 1996, Geoffrey G. admitted that he had kicked Ashley and struck Adam. (Petitioner's Exhibit 11, Page 3). During that same evaluation, Ashley told Dr. Pines that `daddy Geoffrey hurt me — hit me.'" (Petitioner's Exhibit 11, Page 2). This court finds that Geoffrey G. physically abused Ashley prior to her entry into DCF custody in April, 1993. CT Page 9415
After the OTC was signed, Ashley resided in a state-licensed foster home until May 7, 1993, when she was treated at Hartford Hospital after making suicidal gestures. (Petitioner's Exhibit 5, Pages 6-7). She was transferred from Hartford Hospital to Natchaug Hospital, a psychiatric treatment facility, the same day. Ashley was a patient at Natchaug until February 7, 1994, when she was sent to Riverview Hospital, a psychiatric hospital for children operated by DCF. (Petitioner's Exhibit 5, Page 7). While at Natchaug, Ashley disclosed that she had been sexually abused by Geoffrey G. (Petitioner's Exhibit 5, Page 8).
The child was a patient at Riverview Hospital from February 7, 1994 until February 10, 1995. After her discharge from Riverview, DCF placed Ashley in the specialized foster home where she currently lives. (Petitioner's Exhibit 5, Page 7). This foster home is operated under the auspices of a program known as Connecting Children and Families. The cost of Ashley's care in this foster home is quite expensive. The child and her foster family receive social work support from social worker Carol D'Amora of the Connecting Children and Families Program. (Testimony of Carol D'Amora). DCF indicated during this non-bifurcated trial that if terminations were granted, its permanency plan would be to keep Ashley in her current specialized foster care placement, where she has adjusted well during the past two years. (Petitioner's Exhibit 5, Page 13).
During the time that Ashley was a residential patient at both Natchaug Hospital and Riverview Hospital, Kelly D. visited her daughter regularly. (Testimony of Kathy Dayner). At the time the child was transferred from Riverview to the specialized foster home in February, 1995, DCF's long-term goal was still to reunify Ashley with her mother. (Testimony of Diana Forbes). However, DCF briefly suspended the mother's visits with the child in February 1995 in order to allow Ashley to make the transition from the hospital setting to foster care. Kelly D. acquiesced with the petitioner's request that her visits be briefly suspended. (Testimony of Carol D'Amora.) The mother's visits resumed in March, 1995. At that time DCF permitted Kelly D. to visit her daughter once every three weeks. During the period from March, 1995 through August, 1995, Kelly D. had nine visits with Ashley. (Petitioner's Exhibit 7, Page 3). Carol D'Amora of the Connecting Children and Families Program observed some of these parental contacts. Ashley played in the visitation room and Kelly D. interacted with her. (Testimony of Carol D'Amora). The mother's CT Page 9416 demeanor with the child was "cordial and nice." (Testimony of Carol D'Amora). Ashley hugged and kissed her mother at the conclusion of these visits, which all ended on a happy note. (Testimony of Carol D'Amora).
During the summer of 1995, Ashley disclosed to Carol D'Amora that she had been sexually abused by Geoffrey G. (Petitioner's Exhibit 7, Page 3). The child claimed to Ms. D'Amora that Geoffrey had shown her pornographic photographs, had touched her genital area and had required her to touch his genital area. (Testimony of Carol D'Amora).
In September 1995, Ashley made allegations that Kelly D. had sexually abused her. (Testimony of Carol. D'Amora). Ms. D'Amora testified at this trial that she found the allegations made by the child against both Kelly D. and Geoffrey G. to be credible. She testified that the child experienced night fears and bad dreams after visits with the mother, and opined that contact between the mother and child forced Ashley to relive prior traumas. (Testimony of Carol D'Amora). Based on the disclosures of sexual abuse, and the problems which the child experienced after visits, Ms. D'Amora recommended to DCF that Kelly D.'s visitation rights be suspended. (Testimony of Carol D'Amora and Petitioner's Exhibit 7, Pages 3-4). DCF stopped the mother's visitation in September 1995, and Kelly D. subsequently challenged this decision in an administrative appeal. At a treatment plan hearing conducted on February 29, 1996, a DCF adjudicator upheld the agency's decision to cut off contact between Kelly D. and Ashley. The respondent mother has not seen her daughter since visits were terminated in September, 1995.
Dr. Pines dealt extensively with the issue of Ashley's alleged sexual abuse in his August 14, 1996 evaluation report. (Petitioner's Exhibit 11). He noted in pertinent part therein:
 "When asked about Geoffrey, whom Ashley refers to as her father, she stated that he hit her and touched her private parts. She stated that her mother hit her but did not touch her private parts. Later in the interview, Ashley changed her story and three times stated mom and Geoff touched her private parts, both in the genital and anal areas. While Ashley was vague in expressing details, she stated with certainty that both her parents touched her. She expressed fear of both Geoff and her Mom because of `what they did to me' and said it was not safe to live with them." (Petitioner's Exhibit 11, Page 2). CT Page 9417
Dr. Pines conducted his evaluation on three separate days — May 14, 1996, July 14, 1996 and July 3, 1996. During a subsequent session with Ashley, the child made repeated references about being physically hurt by both her mother and father and about feeling safe with her foster parents. (Petitioner's Exhibit 11, Page 2). Following a joint session with Ashley, the mother and the maternal grandparents, Dr. Pines met alone with the child. He noted with respect to this portion of the evaluation that:
 "Discussions in this session led to more confusion and ambiguity of sexual abuse by Kelly. Ashley now raised the issue that Ishmail touched her private parts, although she provided no details. She continued to maintain Geoff also touched her. However, this time she recanted touching by her mother, stating that she was scared when talking about abuse, `got carried away' and did not mean to accuse her mother. She continued to be fearful of both Geoff and her mother and expressed clear worries about her mother's ability to keep her safe. She expressed unhappiness that her mother continued to live with Geoff, stating `daddy could hurt mom' and expressed sadness and anger that her mother was continuing to live with Geoff." (Petitioner's Exhibit 11, Page 6).
Dr. Pines wrote in his evaluation and testified at trial that he was unable to determine with certainty when, or by whom, Ashley was sexually abused:
 "This is a most complex case with ambiguous and often times contradictory information. What is clear is that Ashley was physically abused by [Geoffrey G.]. Also, at some point, Ashley was in all likelihood sexually abused. Ashley has consistently claimed that the perpetrator was Geoff as well as her mother. However, on several occasions she has recanted the allegation against her mother and named [Ishmail R.] a friend of Kelly's as well as Geoff. It is unclear as to when or by whom Ashley was sexually abused. However, her provocative behavior indicated some form of repeated sexual trauma did occur." (Petitioner's Exhibit 11, Page 7).
Kelly D. testified during this proceeding and denied under oath that she ever physically or sexually assaulted Ashley. She CT Page 9418 stated that she recognized Ashley had "been damaged" and admitted responsibility for failing to protect the child. Her testimony at trial about failing to protect the child was somewhat vague, and centered on her belief that she erred in leaving Ashley alone with different baby-sitters.
As alluded to by the psychological evaluator, Ashley's emotional difficulties and varying accounts make it extremely difficult to determine exactly what happened to this child. It was not established by clear and convincing evidence at trial that Kelly D. physically or sexually assaulted Ashley. Although the court accepts Dr. Pine's conclusion that Ashley was "in all likelihood sexually abused," it cannot determine, based on the evidence presented, when or by whom the child was so victimized. The court does find that Ashley, who has been in state care since 1993, has continued to express fearful feelings about both Kelly D. and Geoffrey G. (The mother and her boyfriend had separated for a period of time in 1995, but they subsequently reunited (Petitioner's Exhibit 6, Page 5). Kelly D. gave birth to her second child by Geoffrey G. this past January.) Ashley expresses anxiety about being forced to return to live with Kelly D. and Geoffrey G., and articulates the belief that her mother cannot provide her with a safe and secure home.
When Ashley was committed to DCF custody in April, 1993, the mother signed court-approved expectations. (Petitioner's Exhibit 2). She agreed to keep all appointments set by or with DCF, keep the petitioner and her lawyer advised of her whereabouts, visit Ashley as often as DCF permitted, participate in individual and family counseling, maintain adequate housing and legal income, refrain from substance abuse and involvement with the criminal justice system, sign releases for DCF, and follow the recommendations of the Casey Reunification Program. (Petitioner's Exhibit 2). DCF social workers Dayner and Forbes testified that the respondent basically cooperated with these expectations, and the court finds this to be true. Both social workers expressed concerns during their testimony that Kelly D. was somewhat inconsistent with attendance at her individual therapy, but the court does not find that this amounted to a lack of compliance with the expectation.
In May of 1993, DCF referred Ashley's case to the Casey Reunification Program. Ms. Dayner testified at trial that Casey subsequently conducted an intensive assessment, but decided not to accept the referral. Ms Dayner testified that the program CT Page 9419 declined to provide assistance because Kelly D. and Geoffrey G. displayed a hostile and uncooperative attitude, and lacked insight into the severity of Ashley's problems. The court notes, however, that no representative from Casey was called to testify at this proceeding, and no documentary evidence related to Casey's assessment was introduced. Given the lack of this information, the court is unable to make any finding about Casey's unwillingness to provide reunification services to Ashley and her family.
Despite Kelly D.'s compliance with the 1993 expectations, both of the DCF social workers and Dr. Pines expressed the opinion that the mother "lacked insight" about the severity of Ashley's problems. Ms. Dayner opined that the mother minimized the child's problems, and evidenced a lack of acknowledgment as to what it would take to parent the child.
Dr. Pines concluded from his psychological evaluation of the mother that Kelly D. has not been able to acquire the parenting skills necessary to effectively handle her daughter. He also doubts that the mother will be able to obtain those skills within the foreseeable future. The court accepts the forgoing professional opinions as being accurate and credible, and notes in particular the following comment from the summary of Dr. Pines' August 14, 1996 evaluation:
 "I have no doubt that [Kelly D.] loves her daughter and wants the best for her. Kelly reports and her therapist substantiates, increased maturity and personal growth. However, it seems clear from all reports and observations, that continued growth is necessary. At present, I do not feel Kelly possesses the necessary skills to parent Ashley successfully. Ashley is a significantly emotionally troubled youngster who would tax the most experienced adult. I do not feel Kelly sufficiently grasps the extent of Ashley's problems nor really understands her role in all of this. Repeatedly, Kelly looks for simple solutions to complex problems." (Petitioner's Exhibit 11, Page 7).
 ADJUDICATION AS TO MICHAEL P. (Based on facts as of February 16, 1996)
 1. Abandonment: Pursuant to C.G.S. § 17a-112 (b)(1), the court finds as proven by clear and convincing evidence that the child was abandoned by her biological father as alleged in the CT Page 9420 termination petition. Statutory abandonment occurs where a parent fails to visit a child, fails to display any love or affection for the child and demonstrates no concern for the child's welfare. In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11,438 A.2d 801 (1981). Michael P. has displayed no interest whatsoever in the well-being of this nine-year-old child for virtually all of her life. He has clearly abandoned Ashley.
2. No ongoing parent child relationship: C.G.S. § 17a-112
(b)(4) defines the lack of an ongoing parent-child relationship to mean the absence of "the relationship which ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of a child." Michael P. has had no real involvement in Ashley's life and, hence, has never met any of her needs. Dr. Pines has found that the child has no positive present memories or feelings for her biological father. (See: In re Juvenile Appeal (Anonymous),177 Conn. 648, 670, 420 A.2d 875 (1979). The petitioner has proven by clear and convincing evidence that Michael P. has never, during Ashley's entire life, established an on-going relationship with the child.
3. Acts of commission or omission: C.G.S. § 17a-112 (b) (3) provides that this non-consensual ground for termination of parental rights exists where a child, as the result of acts of parental commission or omission, has been denied the care, guidance, or control necessary for her physical, educational, moral or emotional well-being. By abandoning this child from the time that she was three weeks old, Michael P. failed to prevent, and contributed to, the serious emotional injury which Ashley has suffered. DCF has also proven this count of the petition by clear and convincing evidence. As with the two other grounds referred to above, the court finds that this ground for termination has existed for a period of time well in excess of one year.
ADJUDICATION AS TO KELLY D. (Based on facts as of February 16, 1996)
 1. Parental failure to rehabilitate: C.G.S. § 17a-112 (b) (2) sets forth the criteria for this ground for termination. The statute applies in those cases where:
 "the parents of a child who has been found by the superior court to have been neglected or uncared for have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and CT Page 9421 needs of the child, they could assume a responsible position in the life of the child."
The court finds that Ashley was adjudicated as a neglected and uncared for child by the Superior Court for Juvenile Matters in Plainville on December 16, 1992.
As employed in C.G.S. § 17a-112 (b)(2), the term "personal rehabilitation" has been defined in Connecticut case law to mean the restoration of a person to his or her former constructive and useful role as a parent. In re Migdalia M.,6 Conn. App. 194, 203, 504 A.2d 532 (1986).
The testimony in this non-bifurcated proceeding indicated the strong likelihood that Ashley will require placement in her specialized foster home for a number of years into the future — possibly until she attains adulthood. This court is mindful of the holding of In re Migdalia M., supra. Our Appellate Court ruled in that termination case that a parent need not be able to assume full-time custody of child in order to play a responsible position in the child's life:
 "If, however, the parents of a child with developmental disabilities have parenting limitations but love their child, consistently express an interest in the child's welfare and periodically visit with the child committed to foster care, parental rights should not be terminated, since the situation affords the child both the consistency of foster parenting and the relationship with the natural parents." In re Migdalia, supra, 207-208.
Accordingly, the fact that Ashley may require specialized foster care far into the future, in and of itself, does not preclude Kelly D. from fulfilling a responsible parental role in the life of her child. This court is required to "analyze the respondent's rehabilitative status as it relates to the needs of the particular child" and further to determine that such rehabilitation will occur "within a reasonable time." In reFelicia D., 35 Conn. App. 490, 500, 646 A.2d 862 (1994); In reLuis C., 210 Conn. 157, 167, 554 A.2d 772 (1989).
The court has conducted such an analysis in this case. Ashley was placed under protective supervision by DCF in December 1992, and committed to the petitioner's care and custody more than four years ago. Since then, Kelly D. has had the benefit of individual CT Page 9422 therapy and other supportive services, and she was generally compliant with the expectations to which she agreed at the time of commitment. She knew in April 1993 that Geoffrey G. physically abused both Ashley and her brother, and she has acknowledged in a general sense that she herself failed to protect Ashley. Despite all of the forgoing, this court finds that Kelly D. has not been able to rehabilitate her circumstances to the point where she can play a responsible role in Ashley's life at present, or within a reasonable time in the future.
Ashley's primary needs are the need to know that she will not be abused by the adults in her life, and the need to know that Kelly D. will protect her. Unfortunately, the respondent has not been able to develop the insight, parenting skills and relationship with the child necessary to adequately fulfill either need. The court is well aware of the ambiguous nature of the allegations which Ashley made in 1995, of the child's extensive psychological problems, and of the termination of visitation in the fall of 1995 which has precluded contact between Kelly D. and her daughter since then. However, the court must also consider Geoffrey G.'s admitted physical abuse of the child, its impact on Ashley, and the protracted length of time that this child has already been in state care.
During the first two years after Ashley was removed from Kelly D.'s home, the respondent was not able to allay the child's fears of Geoffrey, or convince the child that she could protect her. Instead of abating, the child's anxieties about Geoffrey and her mother intensified. Ashley began demonstrating negative reactions to the respondent's visits, and DCF ultimately concluded that it was necessary for the child's well-being to stop these contacts. Dr. Pines testified that Ashley views Kelly D. and Geoffrey G. as a "unified pair" against her. Dr. Pines noted in his evaluation that "Ashley continues to feel unsafe with her mother and her relationship with Geoff. While she loves her mother, Ashley does not feel Kelly can provide the kind of safety and security she needs." (Petitioner's Exhibit 11, Page 8).
Kelly D. pointed out during this trial that Geoffrey G. has involved himself in anger management and other therapy. The respondent also articulated her belief that she is now a stronger person, who could protect Kelly from any future threat of abuse. Ashley, however, does not share that perception. The subject child has been residing outside of her mother's home since April, CT Page 9423 1993. Parent-child reunification has not occurred, and it has been apparent at least since 1995 that the child continues to fear her former abuser, and perceives that her mother cannot protect her from future abuse. In order for Kelly D. to have successfully rehabilitated, she had to address Ashley's fears and anxieties by clearly demonstrating to the child that she would protect her. Sadly, the court finds that Kelly D. was not able to do so. This inability prevented the respondent from visiting the child and, ultimately, from achieving restoration to a constructive and useful parental role in Ashley's life.
Based on all of the forgoing, the court finds as proven by clear and convincing evidence that Kelly D. has failed to achieve such degree of personal rehabilitation as would encourage the belief, within a reasonable time, considering the ages and needs of the child, that she could assume a responsible position in Ashley's life. The court further finds as proven by clear and convincing evidence that this ground for termination has existed for a period of time longer than one year prior to February 16, 1996, and that the petitioner undertook reasonable efforts to reunify the child with Kelly D.
2. Acts of commission or omission: C.G.S. § 17a-112 (b) (3) authorizes the termination of parental rights where specific acts of parental commission or omission have caused serious physical or emotional injury to the child. In re Kelly S.,29 Conn. App. 600, 614, 616 A.2d 1161 (1992); In re Sean H.,24 Conn. App. 135, 144-145, 586 A.2d 1171, cert. denied.218 Conn. 904, 588 A.2d 1978 (1991). Although Ashley has sustained serious emotional injuries, the petitioner did not establish by clear and convincing evidence during this trial that acts of commission or omission by the respondent, Kelly D., caused them. Accordingly, that count of the petition is hereby dismissed as to the respondent mother.
 DISPOSITION (As to both respondents, and based on facts through April 4, 1997)
Having found that the petitioner has proven at least one ground for termination alleged against each of the respondents, the court now considers the issue of disposition. The court must determine whether on not the petitioner has established by clear and convincing evidence that termination would be in the best interests of the child. CT Page 9424
Ashley has resided in her current specialized foster home since February 1995. Dr. Pines noted in his evaluation report that the child "expressed a sense of safety and security in her present foster home and expressed a wish to remain there permanently . . ." (Petitioner's Exhibit 11, Page 2). The child told the psychologist that she wants her foster parents to be "my real parents." (Petitioner's Exhibit 11, Page 2). Diana Forbes of DCF noted in the social study which she prepared for this case that the foster home provides Ashley with ". . . safety and security she needs with parental figures she trusts to keep her safe." (Petitioner's Exhibit 5, Page 10) The Connecting Children and Families Program provides intensive support services to Ashley and her foster parents. (Petitioner's Exhibit 5, Page 10). Ashley, who was referred to this program with a "host of inappropriate behaviors," is now demonstrating significant improvement. (Testimony of Carol D'Amora). She is now doing well in school and has better self esteem. (Testimony of Carol D'Amora). If a TPR is granted in this matter, DCF's permanency plan would be to keep the child in long-term foster care with the present foster family, as opposed to placing the child for adoption. (Testimony of Diana Forbes).
DCF, the child's counsel, Carol D'Amora and Dr. Pines all advocate that a termination is in Ashley's best interests. They contend that even though adoption is not being recommended, a TPR is necessary for the child's best interests in order to give her a sense of permanency in her foster placement, and in order to allay the fears she has expressed about being forced to reunite with her mother and Geoffrey G.
The respondent mother opposes termination. Although she concedes that the child should remain at present in specialized foster care, Kelly D. believes that she can protect Ashley and should be allowed to play a responsible role in her life.
The court has carefully considered all of the evidence and testimony offered concerning Ashley's best interests, and the arguments of all counsel relative to disposition. Based on that review, the court finds that Ashley's interests would be best served by long-term placement in her current home and by terminating the parental rights of both her biological parents. The current status of the parent-child relationships, the intensity of Ashley's feelings, Ashley's psychiatric condition and specialized needs, her positive adjustment in her current placement, and the protracted length of time she has been CT Page 9425 committed to DCF all persuade the court that this disposition is essential to the child's well-being.
Before the court may enter judgment, it is required by C.G.S. § 17a-112 (d) to make the following written findings:
1. Services offered: The court finds by clear and convincing evidence that the petitioner and other service providers offered reasonable and appropriate rehabilitation and reunification services to Kelly D. These included visitation, an assessment by the Casey Reunification Program, individual therapy at Catholic Family Services, the Life Guides Program and Bristol Counseling Center, the assistance of therapists at Natchaug Hospital and Riverview Hospital while the child was hospitalized there, and social worker services from DCF and the Connecting Children and Families Program. In connection with a case involving a different child, DCF also offered the mother the services of a visiting nurse and a parent's aid. There was testimony at trial that although those services were offered in connection with a different case, DCF hoped that they would also assist the mother to care for all of her children. (Testimony of Kathy Dayner). The court finds that DCF was unable to provide services to the biological father, Michael P., because he abandoned the child when she was three weeks old and moved out of the State of Connecticut.
2. Reasonable efforts to reunite: The court finds by clear and convincing evidence that the petitioner made reasonable efforts to reunite Ashley with Kelly D. After protective supervision ended, the petitioner pursued reunification from 1993 until 1995, and attempted to facilitate that objective by offering the mother the assistance and services referred to above. The biological father's abandonment and relocation from Connecticut prevented DCF from attempting reunification with him.
3. Court orders: No court orders were entered in this matter with respect to either party. The Superior Court for Juvenile Matters In Plainville set court-approved expectations for Kelly D. when the child was committed on April 23, 1993. The respondent mother was generally compliant with those expectations. For the reasons set forth above, no court-approved expectations were ever established for Michael P.
4. Feelings and emotional ties with parents and caretakers:
Ashley knows her mother, has an attachment with her, and loves CT Page 9426 her (Testimony of Dr. Pines and Petitioner's Exhibit 11, Pages 1 and 7). Because of this, the psychological evaluator has recommended that the child have occasional visits with Kelly D. after a termination enters. He also recommends that Ashley continue to have ongoing visits with the maternal grandparents after a TPR. (Petitioner's Exhibit 11, Page 8). Ashley has expressed fear of returning to live with Kelly D. and Geoffrey G. and does not view her mother as a person who can keep her safe. The child does not know her biological father. She wants to continue to live with her foster parents, and has expressed anxiety about being removed from their care. Ashley has indicated to Dr. Pines that she wants her foster parents to be her "real parents".
5. Age of the child: Ashley is nine years old. Her birthday is December 29, 1987.
6. Parental efforts to adjust conduct, conditions andcircumstances: Michael P. abandoned the child. He has made no efforts to adjust his conduct, circumstances and conditions to effectuate rehabilitation and reunification with the child. Kelly D. complied with court-approved expectations and made efforts to change her conduct, circumstances and conditions to effectuate reunification. As noted at length above, however, Ashley D. continues to be fearful of her mother and the mother's mate, Geoffrey G. Kelly D. has been unable to perform the steps necessary to allay her daughter's fears and convince the child that she could keep her safe.
7. Impediments to maintaining a meaningful relationship: DCF suspended Kelly D.'s visitation in September of 1995 after Ashley made allegations of sexual abuse against her mother and Geoffrey G., and demonstrated adverse reactions to the parent's visits. This decision was upheld in a subsequent administrative appeal hearing conducted by DCF. Kelly D. has not visited with her daughter since September 1995. Although this court does not find as proven by clear and convincing evidence that either Kelly D. or Geoffrey G. sexually abused the child, it also does not find, based on the totality of all the evidence, that the suspension of visitation was an unreasonable action by DCF. Accordingly, it is further found that no unreasonable action of any individual or agency, nor any adverse economic circumstance of either respondent, prevented either parent from maintaining a meaningful relationship with Ashley. CT Page 9427
JUDGMENT
Having considered the seven factors enumerated above, and having found as proven by clear and convincing evidence grounds for termination as alleged against each respondent, it is further found as proven by clear and convincing evidence that it is in Ashley D.'s best interests that both respondents' parental rights be terminated, in order that appropriate permanency planning may be achieved for this child.
Accordingly, it is hereby ORDERED that the parental rights of Kelly D. and Michael P. with respect to the minor child Ashley D. be, and hereby are, terminated. It is further ordered that the Commissioner of the Department of Children and Families be appointed statutory parent of Ashley D. for the purpose of securing an adoptive home or other appropriate permanent placement for said child. Said commissioner shall file with this court, no later than ninety days following the date of this judgment, a written report of the progress made towards such permanent placement.
The court respectfully recommends to the commissioner that consideration be given to the recommendations by Dr. Pines that Kelly D. and the maternal grandparents be allowed visits with the minor child following the termination of parental rights.
The court commends all counsel in this case for the highly professional and dignified manner in which they advocated their respective clients' interests during this proceeding.
Entered at Middletown, Connecticut this 29th day of April 1997.
BY THE COURT:
DYER, J.